s/ Maurice F. Riley
DISTRICT DIRECTOR
NEW YORK DISTRICT

**ST. ASIMI MARITIME COMPANY, LTD., et al., Plaintiffs,**

v.

**The FIRST NATIONAL BANK OF CHICAGO, Defendant.**

**No. 75 Civ. 4554.**

United States District Court,
S. D. New York.

July 22, 1977.

Dickerson, Reilly & Mullen, New York City by Robert W. Mullen, New York City, of counsel, for plaintiffs.

Haight, Gardner, Poor & Havens, New York City, by Edward L. Johnson, Lennard K. Rambusch, Thomas F. Molanphy, New York City, of counsel; Debevoise, Plimpton, Lyons & Gates, New York City, by Samuel E. Gates, Richard I. Janvey, John G. Koeltl, New York City, of counsel, for defendant.

## OPINION

KEVIN THOMAS DUFFY, District Judge.

The First National Bank of Chicago ("FNBC") lent $24.9 million to Anastasios E. Karavias and the several corporations of which he is sole shareholder. The loan agreement dated December 23, 1974, granted FNBC a first preferred mortgage on eight vessels owned by Karavias controlled corporations, a pledge of all shares of stock in Karavias corporations, and a personal guarantee by Karavias for the total amount of the loan. By the fall of 1975, Karavias was in substantial default on the loan.

On September 17, 1975, Karavias and nine corporations which he controls ("the plaintiffs") brought suit against FNBC to enjoin Bank action against the collateral. An evidentiary hearing was held before me. Following the conclusion of the hearing, I was advised that the parties were making substantial progress in settling their dispute. On October 24, 1975, the parties appeared before me and presented an eighteen page agreement which was made an order of this Court ("consent order").

Eight months later, the parties returned to this Court with cross-accusations of non-

compliance with the consent order. Plaintiff moved for an order compelling the defendant to comply with paragraph 17 of the consent order or, in the alternative, to have the entire order rescinded. The defendant cross-moved to cite plaintiffs in contempt and to compel performance of the obligations contained in paragraphs 7, 10, 16 and 23. I heard testimony from representatives of both parties regarding their performance. Attempts to settle the disagreement since that time have been unsuccessful. Reluctantly, I must intervene and decide the conflicting claims of performance.

The plaintiffs' primary contention is that the FNBC has failed to honor its obligations under paragraph 17. The FNBC responds that plaintiffs have not complied with the express conditions precedent to the Bank's performance under paragraph 17.

█ Paragraph 17 provides that "[a]fter performance, and only after performance, of the actions specified in paragraphs 6, 7, 8(a), 14 and 16" the defendants will: (1) discontinue its action in the English courts against Karavias on his personal guaranty; (2) release the vessels TASSOS V and ST. NICHOLAS II from the mortgage; (3) release its money claims on those two vessels; and (4) release and redeliver to Karavias the shares of stock which it holds in the Saint Anastasios Maritime Company Limited and Saint Grigorousa Maritime Company Limited. The parties have stipulated that plaintiffs have complied with paragraphs 6, 8A, and 14; performance under paragraphs 7 and 16 is in dispute.

In part, paragraph 7 provides that:

"The Saint Eirene Maritime Company Limited shall terminate or assign without recourse to a company designated by plaintiff Anastasios E. Karavias its management business and all contracts for the management of any vessels whatsoever and shall not thereafter be responsible or liable for the management of any vessels whatsoever."

On January 7 and March 15, 1976, the attorney for the plaintiffs submitted to the FNBC purported assignments of the St. Eirene Maritime Company Limited ("St. Eirene Maritime") to Magellan, Inc., of Monrovia, Liberia. Apart from the sufficiency of these assignments, which will be taken up shortly, defendant asserts that paragraph 7 has not been complied with in that Saint Eirene Maritime continues to perform management functions.

As evidence of Saint Eirene Maritime's continued management and control, defendant has introduced a copy of a report to the Greek Ministry of Mercantile Marine in Piraeus submitted on stationery bearing the letterhead of Saint Eirene Maritime. The report dated April 1, 1976 opens with the following statement: "[w]e have the honor to advise you that: 1. Our company represents the following vessels . . . ." Nine vessels are then listed. It closes "For Saint Eirene Maritime Co., Ltd. (signature) The Manager." Karavias testified that the signature appearing on the letter is his. Karavias attempted to explain away the report as "an oversight of the accounting clerk [who] wrote it . . . ."

Attached to the report was a statement of personnel employed by Saint Eirene Maritime; the list contained eighteen names. On cross-examination, George Tzimopoulos testified that at the time the consent order was signed, Saint Eirene Maritime employed eighteen individuals. Nevertheless, on April 1, 1976, at a time when Saint Eirene was purportedly out of the ship management business and had agreed not to incur any liabilities, it employed eighteen people. As of July 1976, Saint Eirene still employed sixteen of the original eighteen employees. Some of these employees have threatened to sue the Bank for payment of their salaries (see Defendant's Exhibit K). Avoidance of suits of this nature, which might impair the Bank's collateral, was one of the apparent reasons for the inclusion of paragraph 7.

The April 1 report, which indicates that Saint Eirene continued to represent nine vessels, coupled with the continuation of the same staff from a time when the company was actively engaged in the ship management business to a time when it claimed

to have ceased all such functions, leads me to the conclusion that plaintiff has not complied with paragraph 7. It must be remembered that plaintiffs have moved to compel the defendants to comply with paragraph 17. Since plaintiffs' performance under paragraph 7 is an express condition precedent to defendant's performance under paragraph 17, the plaintiffs must satisfy this Court by the preponderance of the evidence that they have met all requirements of paragraph 7. Although proof on the issue of the assignment would seem to be peculiarly within plaintiffs' control, they have failed to adequately demonstrate their performance.

The Bank also contends that the assignment to Magellan is defective as a matter of law because it fails to assign pre-existing liabilities of the vessels. The plaintiffs argue that paragraph 7 contains no such requirement. The issue carries important practical consequences. Apparently, four of all vessels owned by Saint Eirene Maritime, but not mortgaged to the Bank, are in arrears in their payments to the N.A.T., the Greek National Seaman's Pension Fund. The Bank of Nova Scotia, which had acted as guarantor of these obligations, has filed suit in the Court of First Instance in Piraeus (No. 111/1976) against Saint Eirene to recover payments made to N.A.T. on behalf of the vessels.

The record before me offers little guidance in reconstructing the intention of the parties with regard to paragraph 7. The briefs do not adequately focus upon the issue. The parties, therefore, will be permitted to file additional briefs. Should it be necessary, I will take additional testimony regarding the intentions of the parties and the effect of Greek law on this issue.

The remaining contested preconditions to defendant's performance under paragraph 17 are the duties imposed on plaintiffs by reason of paragraph 16. That provision obligates plaintiffs to furnish defendant or its representative with any information regarding guarantees of obligations of the Saint Emmanuel Maritime Company Limited to Eriksbergs Mek Verstads A.B. and any information regarding any claims asserted against the ST. GEORGE III.

Although the facts are sketchy, it seems that Eriksbergs Mek Verstads Aktiebolag ("Eriksberg") is a Swedish shipping concern which contracted with Karavias (London) Limited and Saint Emmanuel Maritime to build a vessel. The Saint Anna Maritime Company Limited, another Karavias controlled company, agreed on September 28, 1973, to guarantee the Karavias obligation to Eriksberg. In June of 1974, Karavias assigned the underlying building contract to FNBC as security for a loan.

Plaintiffs first argue that there was no necessity to turn over the guarantee since it was given to the Bank at the time of the June 1974 assignment. This misses the point. The October 24, 1975 order placed a new obligation on the plaintiffs and it was their duty to fully comply. George Tzimopoulos, Operations Manager of the Piraeus office of Emmanuel Karavias, Limited, testified for the plaintiffs that on March 20, 1976, Gunther Wegener, loan officer in charge of the Karavias loan at the London branch of FNBC, visited the Piraeus office. Tzimopoulos claims that at Wegener's request he then and there gave Wegener a copy of the document. Wegener denies this.

Two things are clear to me: first, if Tzimopoulos did, in fact, deliver a copy of the guarantee on March 20, 1976, he did so only after several repeated requests by the Bank (see Exhibit J); and second, regardless of whether the Bank received the document at that time, it now has a copy of it. Even in a light most favorable to the plaintiffs, they have been recalcitrant in furnishing the required information.

The parties also dispute the extent to which plaintiffs have supplied information about claims against the ST. GEORGE III. The plaintiffs raise an argument similar to that asserted in connection with the Eriksberg guarantee. They point out that prior to the consent order the vessel was sold for scrap and that the defendant had been fully informed about the terms of the sale. The defendant does not dispute this but re-

sponds that the inclusion of the reference to the ST. GEORGE III in paragraph 16 placed an additional burden on plaintiffs.

Gunther Wegener testified that the vessel had been arrested in Taiwan by the charterer, the Kuwait National Petroleum Company ("KNPC") and later sold. A few months prior to the consent order, he travelled to Taiwan to learn what steps could be taken by the Bank to recover a portion of the sale proceeds under its mortgage on the vessel. Wegener discovered that a dispute was going on among the buyer, the KNPC, and the Tokyo Fire & Marine Insurance Company, which claimed a $500,000 lien acquired by subrogation from a cargo purchaser. Wegener also discovered that under Chinese law, insurance claims of this type are given priority over that of a mortgagee. Wegener has sworn that he requested the insurance file on the ST. GEORGE III from the office of Karavias (London) Limited so that he could determine whether Tokyo Fire & Marine Insurance had a valid priority claim but was not given any correspondence or files by the plaintiffs.

Constantine Papageorghiou, the Karavias liaison with the FNBC, has admitted that he has not furnished any information regarding the ST. GEORGE III since the date of the consent order. However, both he and Karavias have testified that the only known claims against the vessel are those of KNPC and the Bank.

■ I agree with defendant that paragraph 16 placed an affirmative burden on plaintiffs to supply information on any claims against the ST. GEORGE III; plaintiffs could not rightfully rest on materials it had supplied prior to the consent order. At least in the case of the KNPC claim, the existence of which plaintiffs acknowledge, it should have come forward with information. As to the Tokyo Fire & Marine claim, of which plaintiffs disavow knowledge, the better practice would have been for Wegener to make a written request for the information and for the plaintiffs to have responded in writing.

Because of plaintiffs non-compliance with paragraphs 7 and 16, I find that the defendant has properly withheld its performance under paragraph 17.

Defendant has also alleged that plaintiffs have not complied with paragraphs 10 and 23. In connection with the underlying loan agreement, shares of stock in the four corporations, Saint Eirene Maritime, Saint Anna Maritime, Saint Asimi Maritime, and Saint Spyridon Maritime, owning, respectively, the SAINT FOTINI, SAINT ANNA, SAINT ASIMI and TARSEUS III, had been pledged to the Bank, and on September 10, 1975, those shares were voted to elect new boards of directors. Paragraph 10 invested the Bank with the right to "unlimited access" to all records and information concerning the four corporations and vessels, as well as the vessel SAINT GEORGE III. Paragraph 4 obligated Karavias to "affirmatively cooperate" with the Bank with regard to creditors of the four corporations whose stock had been pledged and the four vessels owned by those corporations. The provision also obligates Karavias to refrain from initiating communications with creditors without the Bank's consent and to refer all creditor inquiries to the new managers, Anagel Shipping Enterprises S.A. ("Anagel") and Denholm Ship Management Limited ("Denholm").

The Bank does not dispute that the plaintiffs are in compliance with paragraph 10 as far as supplying information relating to the operation of the four vessels by Anagel and Denholm. The alleged areas of non-compliance with paragraphs 10 and 23 fall within two categories: corporate records of the four pledged corporations and information in connection with the Bank of Nova Scotia suit against Saint Eirene.

As to the corporate records, the proof is inconclusive. At the commencement of the hearing, the attorneys for the FNBC were under the impression that the certificates of incorporation of the four pledged corporations had not been turned over but it now appears that at least copies are in the Bank's possession. Although the corporate seals were not given to the Bank, Karavias has testified that he has attempted to locate

them but has been unsuccessful. As to stock transfer books, Karavias testified that none were kept since the shares were in bearer form. I have no doubt that plaintiffs have turned over a great quantity of documentation to FNBC. However, both of the parties have done a poor job of keeping records on which items have been turned over and which have not. If the Bank has requested a document and plaintiffs believe they have already provided a copy, I see no reason why a duplicate copy cannot be sent.

As previously mentioned, an action was brought by the Bank of Nova Scotia ("BNS") against Saint Eirene in Pireaus to recover monies paid by BNS as its guarantor to N.A.T. The action was commenced on May 17, 1976, and sought a "conservatory arrest," the equivalent of an attachment, of all assets of the Saint Eirene Maritime within the Court's jurisdiction. Paul Avrameas, an attorney admitted to practice in Pireaus, was contacted by FNBC, London, on May 19, and asked to appear in the action. The return date of the BNS application was May 20, but at Avrameas' request the matter was adjourned until May 24. From the date of service until the May 24 hearing, repeated requests for information were made by the London office of FNBC to Karavias (London) by Mr. Geuras of the Piraeus office of FNBC to Mr. Tzimopoulos. On May 24, Avrameas appeared before the Piraeus Court with no information concerning the merits of the suit beyond the pleadings filed by the BNS. Avrameas, therefore, entered the equivalent of a general denial, or denial upon information and belief. No information was received from the Karavias office concerning the guarantees until May 26, the same day that the Piraeus Court granted the petition for a conservatory arrest of the SAINT FOTINI and all other Saint Eirene Maritime assets.

Plaintiffs have attempted to excuse their conduct by arguing that the outcome of the action would have been the same had the information been available from the date of service and that whatever defenses were available could have been raised when the documents were received on May 26. I do not consider that an acceptable justification. Considering the repeated requests by FNBC representatives, the importance of the suit, and the lack of justification for the delay, plaintiffs conduct was a direct and flagrant violation of paragraphs 10 and 23 of the consent order.

The remaining dispute to be unravelled, is that concerning the claim by Todd Shipyards Corporation ("Todd") for monies due arising out of repairs performed on the TASSOS V. It seems that Saint Anastasios Maritime Company Limited owed Todd $437,016 for these repairs and that Todd caused a Liberian lien to be filed against the TASSOS V. In May 1975, Todd had the vessel arrested in Cristobal, Canal Zone. Following the arrest, Karavias entered into an agreement with Todd to sell the vessel but no sale has ever been consummated. On August 27, 1975, Karavias filed an action against Todd in this district, alleging that the repairs to the TASSOS V were improperly performed, 75 Civ. 4240.

In January 1976, Todd commenced an action against FNBC in the High Court of Justice, Queens Bench Division, 1976 T. No. 56, on an alleged agreement between Todd and the Bank, whereby the Bank agreed to assume the debt owing on the TASSOS V. Since that time, the Bank has impleaded the vessel and its owner in the English suit. During the pendency of that action, Todd commenced an action in this district on March 8, 1976, seeking the arrest of the TASSOS V, 76 Civ. 1080.

The Bank now seeks an order from this Court directing the plaintiffs to pay the Todd claim and directing that all hire on the TASSOS V, since the date of the loan, be paid to them. Although the Todd claim was known to plaintiffs and defendant prior to the entry of the consent order, there is no reference in that order to the Todd claim, or, in more general terms, to the debts of the TASSOS V or its owner Saint Anastasios Maritime.

In order to protect the Bank's collateral, which was threatened by an impending loss of Liberian registry and insurance coverage, I issued an order on April 8, 1977

directing the TASSOS V to proceed from Callao, Peru, to Balboa, Canal Zone. The vessel has, in fact, arrived in Balboa and upon its arrival FNBC commenced a mortgage foreclosure proceeding against the vessel and secured its arrest, Docket No. 77–0097–B. I have been advised by letter of July 8, 1977, that a default judgment and order of sale has been entered by the United States District Court for the District of the Canal Zone.

In view of the pendency of the Bank's third-party action against the vessel and its owner in the English courts, and the default judgment and order of sale in the Canal Zone, it is wholly unnecessary for me to issue an order directing payment of the Todd claim. Moreover, such a direction from this Court would go far beyond the provisions of the consent order and would require the adjudication of claims of those not party to this action.

■ I now turn to the relief to be awarded in light of plaintiffs' wilful non-compliance with the consent order. The parties are linked together by the underlying loan agreement, the mortgages on the vessels, the pledges of stock, and the consent order and judgment. Cooperation, not retribution, is required. But if cooperation is not possible and violations of this Court's order continue, I will hold the offending party in contempt.

For the time being, however, I will require the following:

(1) Within 10 days the defendant is directed to submit to the plaintiffs a complete item by item list of the information which it still requires. Within 10 days thereafter, plaintiffs are directed to supply the information in writing or state its objection to the requested item to this Court.

(2) Within 20 days Anastasios Karavias and his counsel are directed to meet with FNBC officials in New York, or at another location agreed upon by the parties, to attempt a resolution of the Magellan assignment problem. If, within 20 days after the initial meeting no resolution is reached, the parties are directed to submit further briefs on the issue and, if necessary, I will hear testimony. Only after the Magellan question is resolved can I consider defendant's obligations, if any, under paragraph 17.

(3) If any further violations of the consent order or any violation of the directions contained in this opinion occur, contempt proceedings may be commenced by submitting a proposed order to show cause.

(4) The defendant is directed to forthwith settle an order in conformity with this opinion.